Roberta S. Savage (SBN 202940)
221 G Street, Suite 201
Davis, CA 95616
Telephone: (530) 753-4497
Facsimile: (530) 753-4498
roberta@robertasavagelaw.com

Attorney for
A.W.

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| A.W., a minor, By and Through Nancy Dinh, Her Guardian Ad Litem,<br><br>           Plaintiff,<br><br>v.<br><br>PIEDMONT UNIFIED SCHOOL DISTRICT,<br><br>           Defendant<br>_____/ | CASE NO.<br><br>COMPLAINT |

NOW COMES Plaintiff A.W., a minor by and through Nancy Dinh, Her Guardian Ad Litem, files this complaint against Defendant Piedmont Unified School District, and alleges as follows:

SUMMARY OF THE CASE

1.      Plaintiff, A.W., has been aggrieved by a final order rendered by an administrative law judge (ALJ) from the California Office of Administrative Hearings (OAH) on or about June 7,

1. 2024. This action is brought pursuant to Section 1415(i)(2)(A) of Title 20 of the United States Code, also referred to as the Individuals with Disabilities Education Act (hereinafter "IDEA"). (20 U.S.C. §1415(i)(2)(A); *see generally* 20 U.S.C. §§ 1400 et seq.).

2. A.W.'s parents filed a request for a special education administrative hearing with OAH in December 2023 alleging that the Defendant failed to provide A.W. with a free and appropriate public education (FAPE) from December 6, 2021 through the 2023-2024 school year.

3. A.W. has been aggrieved by the ALJ's June 7, 2024 Decision denying her claim and the relief sought.

## JURISDICTION

4. This action arises under the laws of the United States (*See* 20 U.S.C. §§ 1415(i)(3)(A), 1415 (e)) and the State of California (*See* Cal. Educ. Code § 56507(b) & (d)). Jurisdiction is conferred on this Court pursuant to 28 U.S.C. §1331 and 28 U.S.C. § 1367(a).

5. A.W. and the Defendant reside within the County of Alameda, in the Northern District of California, and all of the events that are the subject of this complaint took place within the Northern District of California.

## PARTIES

6. A.W. is a citizen of the United States and resides with her family in the County of Alameda, within the boundaries of Defendant's educational jurisdiction. A.W. is a child diagnosed with multiple disabilities and is eligible for special education and related services pursuant to the IDEA, and Sections 56000 et seq. of the California Education Code.

7. The Defendant is a public entity organized and existing under the laws of the State of California, with the capacity to be sued. The Defendant receives federal funds from the United

States Department of Education pursuant to IDEA, and is required to provide a free and appropriate public education (FAPE) in the least restrictive environment to all disabled children whose parents reside within the Defendant's educational boundaries.

## STATUTORY SCHEME UNDER IDEA

8.      IDEA (formerly known as the Education for All Handicapped Children Act, P.L. 94-142) was adopted in 1975 to ensure that all children with qualifying disabilities receive a public school education.  In adopting IDEA, Congress found that the educational needs of millions of children with disabilities were not being met because the children: (A) did not receive appropriate educational services; (B) were entirely excluded from the public school system and from being educated with their peers; (C) had undiagnosed disabilities preventing them from having a successful educational experience; or (D) received services outside the public school system funded by their families because of a lack of adequate resources within the public school system. (20 U.S.C. § 1400(c)(2)(A-E).)  Therefore, Congress adopted IDEA "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for employment and independent living." (20 U.S.C. § 1400(d).)

9.      Educational programs for children with disabilities are designed and implemented through Individualized Education Programs (IEPs) which contain, among other things, statements of the following: the child's present levels of educational performances, annual goals, the specific educational services to be provided to the child and the extent to which the child will be educated in regular education programs. (20 U.S.C. § 1414(d).)  In addition, Congress required that educational programs for children with disabilities be implemented, to the

maximum extent appropriate, in the regular educational environment and that no child with disabilities be removed to special classes or separate schools, unless, with the use of supplementary aids and services, the child cannot be educated satisfactorily in the regular education environment. (20 U.S.C. § 1412(a)(5).)

10. Pursuant to 20 U.S.C. § 1415(b)(6), whenever a parent disagrees with a proposed IEP, the parent may file a complaint with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to the child. Pursuant to 20 U.S.C. § 1415(f)(1), whenever such a complaint has been received, the parent shall have an opportunity for an impartial due process hearing which shall be conducted by the state agency assigned to conduct these hearings. As required by IDEA, California has established an impartial due process hearing procedure through the California Office of Administrative Hearings (OAH) in Sacramento, California.

11. Pursuant to 20 U.S.C. § 1415 (e)(2)(F), agreements entered into as part of the mediation process of the IDEA are enforceable in federal court.

## STATEMENT OF RELEVANT FACTS

12. A.W. is a sweet, young girl who loves to learn. She struggles with social anxiety and autism. She was found eligible for special education in December 2020 after a protracted evaluation process. Her initial IEP was based upon Defendant's evaluations that recognized the impact of her social anxiety and autism. Her IEP included the "regular/established AM drop off routine" accommodation because of her history of school refusal. The initial evaluations determined that A.W. "has challenges related to anxiety and withdrawal, particularly as it relates to social situations." Further A.W. "struggles with emotional regulation in both the home and

school environment." "A.W.'s reading, writing and math skills are at or above grade level." A.W. "experiences social anxiety at both home and school." A.W.'s "challenges with social communication, peer interaction and lack of flexibility are hallmark characteristics of Autism Spectrum Disorder." This was the foundation from which A.W.'s IEPs should have been developed. Her initial IEP from December 2020 and the IEP amendment from May 2021, was supposed to be the plan implemented with A.W. when she started in-person at Havens.

13. Her father testified that A.W. was eager to start school and they were often the first people on campus at the start of the school year. He also described their morning routine as being the same since her younger brother was born (5:30/6:00 a.m. wake-up, reading, co-regulation activities, getting dressed, eating breakfast and going to school). A.W.'s family lives 3 blocks from Havens so it was a short walk to school.

14. When A.W. entered Havens Elementary her then-current IEP was the combined May/August 2021 IEP which continued the "regular/established AM drop off routine" accommodation. A.W. started off the year strong as she was eager to go to school in person, even after getting lost on campus. Although an agreed-upon accommodation the Defendant did not implement her "regular/established AM drop off routine" accommodation. A.W.'s eagerness changed in October 2021 as she began experiencing greater stressors at school. This is when her school refusal started and she never recovered.

15. There were a variety of issues that arose starting in October 2021 that fostered A.W.'s school refusal. A.W.'s parents in early October raised safety concerns in the class with her teacher, Ms. Molly Coffey-Smith (special education teacher) and Principal Anne Dolid. This included A.W. being hit by boys wrestling in class and her being hit in the head by a boy

jumping.  A.W. received the wrong lunch and was unable to self-advocate for the correct school lunch, so her parents stopped ordering it.  A.W. was bullied at lunch being accused of things she did not say, having hurtful statements made by another student towards A.W. about both A.W. and her lunch being gross, and having her glasses grabbed off her face.  On more than one occasion, her parents included Ms. Morris (general education school counselor) in the emails documenting their concerns about A.W.'s anxiety due to negative peer interactions at school, including a time when A.W.'s hand was clawed by another student.   The ALJ Decision stated that "accidents" happened but downplayed the totality of the incidents that happened to A.W. and the impact they had on her.

16. An IEP team meeting was held on October 26, 2021 to discuss the SCIA report.  The October 4, 2021 observations in the report included examples of A.W.'s anxiety.  At the IEP team meeting, A.W.'s parents and Dr. Kathryn McCarthy (her primary therapist) shared with the team that the school stressors caused school refusal.  After the IEP team meeting, A.W.'s parents notified the team that she was anxious about the noise level in class.  Ms. Coffey-Smith described the types of peer struggles A.W. had in school, specifically "[s]he either did not want to play with someone, needed help on how to initiate plan, or someone did not meet her expectations around social interactions" and mentioned the morning transition to school but does not mention how the Defendant would implement her agreed-upon accommodation addressing this.  A.W. had 12 total tardies in October and November 2021 which was the start of her school refusal.

17. Mr. Williams described A.W.'s school refusal as tantrums, hiding behind him, sitting and reading in the office, refusing to go into the office and refusing to go to class.  Ms. Dinh testified

that she observed a Havens staff member drag A.W. down the hall, A.W. refused to enter the office, and A.W. would stay outside on the benches and tables. Ms. Dolid added that at times A.W. would stop walking if adults were following her to class and would remain in the office after her parents left. A.W.'s school refusal was clearly observable to any of Defendant's staff from October 2021 through the end of the 21/22 school year, yet no data regarding her arrival time, length of time before going into class, or what she was doing on the campus and where before entering her classroom, was taken.

18. By her December 7, 2021 IEP meeting, A.W.'s tardies spiked as she continued to struggle with issues at school, such as, unexpected fire drills, negative peer interactions and the noisy classroom. The IEP team still took no steps to address these issues or to implement the agreed upon "regular/established AM drop off routine" accommodation. After the IEP, Ms. Arata acknowledged not wanting to increase A.W.'s stress about getting to school on time. A.W. had 9 tardies in December 2021.

19. A.W.'s parents continued to bring Dr. McCarthy and Dr. Alyssa Greenberg (behavior consultant) to IEP team meetings to help advocate for the appropriate support – a trained aide and behavioral supervision for the aide. Their requests were ignored and specific data, though requested 6 times in one heated IEP team meeting, was never provided. Dr. Greenberg and Dr. McCarthy never wavered on their recommendation for A.W. Her parents provided consent to her IEP in March. They continued to request the support of an ABA trained aide and supervision.

20. Defendant's staff testified that there was no one person in charge of monitoring implementation of A.W.'s IEP. Defendant's staff testified that they did not know who made specific changes to A.W.'s IEP.

21. After A.W. returned to school in February 2022, her attendance improved but quickly reverted to school refusal. She had 4 tardies in February 2022.

22. In March 2022 A.W. continued to have struggles at school, including an unexpected toileting accident, being hit in the face with a shoe and reporting struggles with the para in her class. By late March 2022, Ms. Seibert asked about A.W.'s missing school. A.W. had 15 tardies in March 2022.

23. The issues continued through April of 2022. A.W. reported that her teacher used demeaning language in class. Dr. Greenberg observed A.W. on April 28th and still observed her signs of Anxiety. Dr. Greenberg described this in her testimony and no witness refuted her statements.

24. Austin Lambe, Defendant's behavior analyst, completed a behavior assessment of A.W. He did not observe A.W. on the day that Dr. Greenberg observed. Instead, he testified that he escorted Dr. Greenberg to the campus. He did not follow up with her about her observation. A.W. was tardy every day that Mr. Lambe observed except the first day. Mr. Lambe had ample opportunity to observe A.W.'s morning routine but did not. A.W. had 10 tardies in April 2022. The ALJ Decision did not fault Mr. Lambe for his lack of observing A.W.'s school refusal.

25. An IEP team meeting was held in May 2022 to discuss Ms. Peirce's assessment and Mr. Lambe's report. The main difference on this IEP was the inclusion of a Friendship Group. Ms.

Dinh consented to the IEP on May 15, 2022 and additionally requested consultation from Ms. Peirce.  No one ever followed up with Ms. Dinh.

26.     By year's end A.W. was not getting class jobs (an agreed upon IEP accommodation), was tardy 6 times in the final weeks of school, and Ms. Coffey-Smith emailed her parents that it took 25 minutes after they dropped her off, to get her into class one day, yet no mention was made of the "regular/established AM drop off routine" accommodation.  A.W. had 6 tardies in the last month of school, when many fun activities occur.

27.     After school ended, A.W.'s parents enrolled her at Ecole Bilingue de Berkeley (EB) starting in the 2022 summer and extending through the 22/23 school year.  She immediately began receiving services from Whole Child, a private agency that provides behavioral services to students in both public and private schools, including applied behavior analysis (ABA) interventions.  A.W.'s parents provided the required 10-day notice.  Dr. Harter responded that he "forwarded it to" his "lawyer" and would respond to them "sometime next week."  Dr. Harter never followed-up with A.W.'s parents.

28.     **22/23 School Year:**  EB developed a learning plan for A.W. and started the year with a team meeting to discuss her program with her parents and private providers.  A.W.'s program at EB included 4 hours per day of an ABA trained aide provided by Whole Child, 2 hours per week of supervision provided by Whole Child, specifically, Dr. Susan Nachand (supervisor with Whole Child) , 2 hours per week of family support provided by Whole Child, 1 hour per week of speech and language therapy and 1 hour per week of occupational therapy.  EB provided her with a counselor to address "emotional expression, emotional language, social skills", a learning

specialist once a week to address writing and support from Benedicte Cambon (learning specialist at EB) weekly.

29.     Although A.W. had a smooth transition to EB, there was some school refusal to address. This was addressed quickly with collaboration, the preparation that the team did in advance of A.W. starting at EB and with the consistent program implementation that was provided by EB and Whole Child.

30.     Dr. Cynthia Peterson, pediatric neuropsychologist, assessed A.W. in November/December 2022. She confirmed A.W.'s autism spectrum disorder and social anxiety diagnoses and her very high cognitive capability and academic achievement. Dr. Peterson described how A.W.'s anxiety impacted her and how her parents helped regulate her, which was also observed by the staff at EB in December 2022. She recommended 4 hours per day of 1:1 ABA paraeducator support, 2 hours per week of supervision and 2 hours per week of family support. Dr. Peterson recommended that she be assigned to "a smaller campus, with small class size, to minimize triggering the anxiety she already gained at Havens."

31.     Ms. Dinh requested an IEP on January 17, 2023. The Defendant convened an IEP team meeting on March 7, 2023. In advance of the meeting, Ms. Dinh provided the Defendant with copies of Dr. Peterson's report and Dr. Nachand's report. Prior to the Defendant did not ask to assess A.W.. The Defendant made no offer of placement at this meeting.

32.     Dr. Peterson testified about her participation in the March and May 2023 IEP. She stated that she believed that the Defendant did not consider her report in making the offer of placement.

33. Dr. Nachand reviewed her report at the March 2023 IEP showing A.W.'s progress at EB with the support of a 1:1 ABA trained aide. A.W. spent little time out of class and rarely resisted going to class. Dr. Nachand also testified that the Defendant did not consider her input in making the offer of placement.

34. The Defendant then assessed A.W. and presented reports and observations to her IEP team in May 2023. Dr. Shelly Lynch testified that she did not receive a written document from the behavior analyst as part of the assessment process. Dr. Lynch did not interview A.W. or provide her with rating scales, nor did she provide rating scales or interview Dr. Nachand or A.W.'s aide. A.W.'s parents put no limitations or conditions on how Dr. Lynch conducted her assessment. Although a behavioral assessment was also completed, it was never put in writing.

35. At the May 2023 IEP team meeting, the Defendant proposed a similar program to what had been proposed in the past. The primary addition was 2 hours annually of behavioral supervision for A.W.'s transition to a Defendant program. Dr. Nachand and Dr. Peterson both testified that was insufficient to meet A.W.'s needs making it inappropriate. The Defendant continued to offer Havens.

36. A.W. made progress throughout the 22/23 school year at EB with the support of Whole Child, occupational therapy and speech and language therapy.

37. A.W.'s parents rejected the Defendant's offer and provided continued notice that they would place A.W. at EB and seek reimbursement for all related expenses. The Defendant never responded to this notice.

38. **23/24 School Year**: A.W. returned to EB for the 23/24 school year. EB again developed a learning plan for her. She continued to make progress in her placement.

39. A.W.'s unique educational needs are that she is a bright young girl who "love[s] books and learning". She is above average academically and cognitively. She has autism and social anxiety that impact her ability to access her education. When she is comfortable and in a consistent environment, A.W. can engage with familiar and unfamiliar peers, she is less anxious, she can self-advocate, she asks for help interacting with peers, manages transitions and enjoys school. When she is in an uncomfortable and inconsistent environment, she shows school refusal and emotionally breaks down at home about her day.

40. A.W.'s unique circumstances are that she benefits from consistent ABA support at school with supervision, family support, in a small school environment. As shown at EB, the ABA support does not need to be a full-time aide when her entire team works in concert to support her throughout her day, starting with her morning transition to school. The ABA support must provide scaffolding for A.W. in self-advocacy, peer interactions and self-regulation. She benefits from speech and language group work to address peer communication and occupational therapy to help her create her own self-regulation tool. In a well-coordinated program, A.W. thrives.

41. A.W.'s unique circumstances include her participation at Havens Elementary School where she exhibited school refusal starting in October and continuing through the end of the year. She was in a rowdy class of students, was bullied by peers, spoke to few people and emotionally broke down at home regularly. To this day, she talks with Ms. Isono, her private occupational therapist, about the challenges when she was at Havens and refuses to participate in any activity or event held at the Havens school site, including weekend sport programs.

42. On December 6, 2023, Plaintiff filed a request for an administrative due process hearing alleging past and continuing violations of the IDEA from December 6, 2021 through the end of the 2023-2024 school year.

43. On January 29, 2024, the Parties participated in a Mediation without reaching a resolution.

44. A Pre-Hearing Conference was held on March 11, 2024 by ALJ Brian Krikorian. The Plaintiff's issues were slightly revised by ALJ Krikorian. A.W. later withdrew Issue 2b.

45. ALJ Clifford Woosley convened an eight (8)-day special education administrative hearing on March 19, 20, 21, 25, 26, 27, 28 and April 3, 2024.

46. Dr. Cynthia Peterson, pediatric neuropsychologist, testified on the morning of the second day of hearing. She was the first witness to complete their testimony. After the conclusion of all direct and cross-examination, ALJ Woosley examined Dr. Peterson about the BASC testing instrument. ALJ Woosley started his line of questioning by explaining that he had studied the BASC assessment tool. ALJ Woosley accused Dr. Peterson of not accurately using the BASC. After questioning about the BASC, Dr. Peterson pointed out to ALJ Woosley that she did not use the BASC test instrument in her testing. Instead, she used the MASC test instrument. ALJ Woosley apologized and did not question her further.

47. ALJ Woosley conducted very little questioning of witnesses after that.

48. Closing briefs were submitted by both Parties on May 6, 2024.

49. ALJ Woosley issued his 80-page Decision on June 7, 2024. Plaintiff did not prevail on any issue. Plaintiff is aggrieved by the Decision.

FIRST CAUSE OF ACTION
(20 U.S.C. §1415)
(Claim For Relief against DISTRICT for denial of FAPE –
No deference to administrative Decision)

50. Plaintiff realleges paragraphs 1 through 49, inclusive, as set forth above and incorporates the same as if fully set forth herein.

51. ALJ Woosley's June 7, 2024 should be afforded no deference because it does not evince that he carefully and impartially considered all the evidence.  An example of this is that ALJ Woosley evinced a clear bias against Plaintiff's assessor, Dr. Cynthia Peterson.  He challenged her assessment tools during the hearing only to be corrected that she did not use the assessment tool he accused her of using incompletely.  He minimized her background and experience in the decision.  He criticized her report without citing contrary evidence in the record.  He criticized her opinions without any basis or citation to the record.

52. ALJ Woosley's June 7, 2024 should be afforded no deference because it does not evince that he carefully and impartially considered all the evidence.  A second example of this is that ALJ Woosley consistently overstated the background and experience of each Defendant witness while understating the background and experience of each of Plaintiff's witnesses.  Dr. Peterson testified to her extensive curriculum vitae of work and experience related to neuropsychological assessment, yet ALJ Woosley minimized her background and experience in the Decision.  He treated Dr. Alyssa Greenberg and Dr. Susan Nachand in the same manner.  To the contrary, Jessica Seibert, Anne Dolid and Molly Coffee-Smith were described in a more robust manner, as was Dr. Shelly Lynch, Austin Lambe and Marianne Peirce.  The only explanation for this treatment of background and experience is that ALJ Woosley was biased against Plaintiff's witnesses and biased in favor of all District witnesses.

53. ALJ Woosley made factual determinations that were favorable and detailed to Defendant even considering substantial contradictory evidence. There was no evidence presented that the Defendant implemented the AM morning routine accommodation and yet ALJ Woosley did not discuss this critical fact in the Decision. Nor did the Decision state why Plaintiff's witnesses were discredited for not observing her morning arrival, but Defendant's witnesses were not. Nor did he discredit any of Defendant's witnesses for failing to take any data related to Plaintiff's school refusal and morning arrival. ALJ Woosley's factual determinations were one-sided and did not evince a careful, thorough or neutral analysis of the record.

54. ALJ Woosley's June 7, 2024 Decision should not be deferred to because it does not evince that he carefully and impartially considered all the evidence presented. An example of this is that he misstated as well as omitted material evidence regarding the issues therefore his findings are not supported by the evidence. Examples of this error include a key aspect of this case, specifically A.W.'s school refusal. Instead of acknowledging that the only witnesses who observed this regularly were her parents and that even though the school team was aware of A.W.'s school refusal, no data was collected by any team member regarding school refusal. ALJ Woosley criticized only Plaintiff's witnesses who had not observed the morning school refusal. A.W.'s father described in detail her school refusal, when in the school year it started, how they addressed it at home, and the difficulties he had with dropping her off at school, including that he observed through the office window that A.W. did not go to class immediately. Other witnesses, such as Anne Dolid, also described A.W. sitting in the office after her parents had dropped her off and A.W. stopping when walking with an adult to class. ALJ Woosley also misstated the length of time and amount of school refusal, including how it included both refusing to arrive to

school on time but then also refusing to go into her class. He also misstated the progression of A.W.'s school refusal.

55. The Decision misapplies the law related to a free, appropriate public education (FAPE), the procedural and substantive requirements related to a FAPE, the factual and legal basis for a predetermination claim and the factual and legal analysis that applies when a family provides clear written notice of their intent to place a student and seek reimbursement.

56. The June 7, 2024 Order issued by ALJ Woosley is not entitled to deference due to the ALJ's bias against Plaintiff's witnesses, the failure to explain conflicting evidence, and failure to conduct a thorough and careful factual and legal analysis.

57. Plaintiff will suffer grave and irreparable harm for which no other adequate legal remedy exists if the June 7, 2024 Order of the California Office of Administrative Hearings is not set aside and specific findings made that are consistent with the provisions of IDEA, California law, legal precedent in this jurisdiction, and the factual record.

58. Plaintiff has exhausted all administrative remedies pursuant to 20 U.S.C. §1415.

SECOND CAUSE OF ACTION
(20 U.S.C. §1415)
(Claim For Relief against Defendant for denial of FAPE)

59. Plaintiff realleges paragraphs 1 through 49, inclusive, as set forth above and incorporates the same as if fully set forth herein.

60. During the 2021-2022 school year the Defendant denied A.W. a free, appropriate public education by failing to appropriately address her behavioral issues and school refusal at school. Plaintiff continued to demonstrate school refusal up through the end of the school year that went unaddressed by the Defendant. Plaintiff's excessive amount of tardies documented by the

Defendant that started in October 2021 and continued through the final weeks of school was sufficient to prove that there was an issue that was unaddressed by the Defendant. Plaintiff did not benefit from the services she received from Defendant during the 21/22 school year.

61.     Defendant's May 2022 and March/May 2023 IEP offers were not reasonably calculated to confer educational benefit to A.W. based upon the known information at the time. The information known at each time was not incorporated into the Defendant's IEP offers of placement. Plaintiff's needs related to her autism and social anxiety and how both manifested in Plaintiff were not incorporated into her IEP. At all times, the Defendant failed to address the underlying cause of Plaintiff's school refusal at Havens and incorporate sufficient support into her IEP.

62.     Defendant denied Plaintiff a free, appropriate public education by pre-determining the May/March 2023 IEP offers. Dr. Peterson and Dr. Nachand both testified that their reports were not considered by the District in making the IEP offer. The ALJ disregarded their testimony. Defendant also failed to consider the input of her parents throughout all relevant times.

63.     Defendant denied Plaintiff a free, appropriate public education by failing to offer Plaintiff appropriate behavioral support for the 22/23 and 23/24 school year. Plaintiff presented ample evidence of her need for appropriate behavioral support for the 22/23 and 23/24 school year. By the end of the 21/22 school year, it was clear that Plaintiff still struggled with school refusal and required in school support through a trained aide with appropriate supervision. By the time of the 23/24 school year, Plaintiff had had an extremely successful year at EB and that information was presented to the Defendant to incorporate into her IEP. It was not. Instead, the Defendant continued to offer a similar program each year that it had been providing to Plaintiff during the

21/22 school year at Havens Elementary School where Plaintiff struggled with excessive school refusal.

64.     Plaintiff required a smaller school setting for the 22/23 and 23/24 school years that were not offered by the Defendant.  Defendant could have proposed that Plaintiff attend one of Defendant's smaller elementary schools, as recommended by Dr. Peterson.  Defendant did not do this and instead acted like school location was interchangeable.

65.     Plaintiff benefitted from the placement and services that her parents provided her.  There was no evidence presented to the contrary.

66.     Plaintiff will suffer grave and irreparable harm for which no other adequate legal remedy exists if the June 7, 2024 Order of the California Office of Administrative Hearings is not set aside and specific findings made that are consistent with the provisions of IDEA, California law, legal precedent in this jurisdiction, and the factual record.

67.     Plaintiff has exhausted all administrative remedies pursuant to 20 U.S.C. §1415.

PRAYER

WHEREFORE, Plaintiff respectfully prays for the following relief:

1.     a determination that the ALJ's decision should be afforded no deference;

2.     a determination that the Defendant denied A.W. a free, appropriate public education at all times;

3.     parental reimbursement for all costs associated with A.W.'s placement at Ecole Bilinque de Berkeley, speech and language therapy, occupational therapy, and transportation through the conclusion of the special education administrative hearing based upon proof of costs submitted as part of the administrative record;

4. reasonable attorneys' fees and costs incurred for pursuing this matter and

5. any other equitable relief determined to be appropriate by this Court.

Respectfully Submitted,

ROBERTA S. SAVAGE
Attorneys for Plaintiff A.W.

Dated: September 3, 2024     By: *Roberta Savage* (signature)
Roberta S. Savage